IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TYRELL P. WARE, | ) | |
|     Petitioner, | ) | Civil Action No. 12-149 Erie |
| | ) | |
| v. | ) | District Judge Nora Barry Fischer |
| | ) | Magistrate Judge Susan Paradise Baxter |
| KENNETH R. CAMERON, et al., | ) | |
|     Respondents. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I.    RECOMMENDATION**

It is respectfully recommended that the petition for a writ of habeas corpus filed by Petitioner, Tyrell P. Ware ("Petitioner" or "Ware"), be denied and that a certificate of appealability be denied.

**II.    REPORT**[1]

    **A.    Relevant Background**

In April of 2006, an Erie County jury found Petitioner and his co-defendant, Marlon Gunn, guilty of involuntary deviate sexual intercourse ("IDSI"), sexual assault, aggravated assault, criminal conspiracy, and unlawful restraint/serious bodily injury. Petitioner's convictions arose from his participation in the sexual assault of Ryan Ortiz on April 20, 2005, on the campus of Edinboro University when they were students there.

The Court of Common Pleas of Erie County summarized the evidence introduced at Petitioner's trial as follows:

> At about 3:15 AM on the day of the assault, the victim was spending the night in his friend's, Brandon Ray['s] dorm room (C-32 in Shaffer Hall). He decided to watch

---

[1]     Respondents have submitted the Common Pleas Court's file. The documents in that file are indexed and numbered 1 through 64. They shall be cited to as "CP Dkt. No. ___."

1

television in the defendants' room (C-29 in Shaffer Hall) that was located across the hall from his. At the time, the victim, Ware, and Gunn were good friends. As he entered defendants' room, he smelled marijuana and observed Gunn, Ware, Stewart Johnson, and an unknown person playing video games. They smoked marijuana on a regular basis.

Later, a campus police officer knocked on the door and entered the room. He found marijuana with the help of a drug sniffing dog. After this incident, the victim returned to Ray's room and went to sleep.

At about 10:00 AM, Ms. Urlene Boisette (generally known to engage in various sexual activities as a dominatrix) was awakened by a cell phone call from Gunn. She testified "that he wanted me to come into his room, it was an emergency. When she got to the defendants' room, they were getting dressed so she went to Ray's room to use the computer (to check her email). Ray exited the room as Ms. Boisette entered.

The victim awoke around 10:15 AM. He was alone. Gunn entered Ray's room and called the victim a "snitch" and told him not to leave the room. Gunn also told him: "We know what you did. We know that you the one that called the police, because yesterday we had a drug bust. There was no way they would have know[n] that. You must be the one that did it. We know that you did that." The victim responded "I'm not a snitch. I didn't do that." Boisette heard the entire conversation.

At that point, Gunn and Ware called Boisette out into the hallway and told her about the drug incident. They told her that "where they're from snitches don't get away easy like that." When Boisette tried to dissuade them, they stated: "why don't you go ahead and do what you do, dominatrix that you do, to Ryan." Eventually, Boisette agreed to the plan and left to retrieve her "sex toys." Gunn also told Casey Bard, a student that lived in the room next to Ray's that "I'm going to beat him up, don't worry about it."

The victim was awakened fifteen minutes later by Gunn, Ware, and Boisette. She possessed a bucket and a basket containing a belt, dildo, finger condoms and lubricant. Gunn again accused the victim of being a "snitch." Ware stated that they were going to retaliate. Next, Gunn and Ware each donned a pair of gloves and started to hit the victim. They slapped and punched him in the face.

During the assault, Boisette urinated into the bucket. Gunn and Ware held the victim on Ray's bed while Boisette poured the bucket of urine on him. They next stripped the victim of his clothes. He was forced by Gunn and Ware to stand up as they held him in place by his arms and wrists. Then Boisette struck the victim's face, back, and legs with a belt made of "plastic with metal holes in it and a pair of handcuffs attached to it." The victim cried and screamed: "Stop!" Gunn and Ware continued to call the victim a snitch and told him "this is what you [the victim] were going to get." They pushed his face into pillows and played loud music to drown his wailing.

At that point, John Matters, a mutual friend of the victim, Gunn and Ware knocked and entered the room. Gunn told him: "If you hear anything or if anybody asks you anything, tell them you didn't see anything."

Boisette had intended only to beat the victim. However, Gunn stated: "You're not done yet." He told her to "Go ahead and use that thing to put up his ass." At this point the victim "was in pain, he was shocked, he was crying, just distraught."

Boisette lubricated the dildo while the defendants held the victim by his arms, face down in the pillows on the bed.[10] Gunn encouraged Boisette to insert the dildo by stating: "He deserves it, so give it to him." Boisette inserted the dildo into the victim's anus multiple times while he screamed and pleaded with them to stop. The victim described the experiences as "pure pain." Boisette finally stopped when the victim began "bleeding from … [his] anus."

> [10] While the victim's face was against the bed, he had trouble breathing (from asthma) and stated: "Let me go. I can't breathe." Gunn held the left arm while Mr. Ware held the right arm. Gunn threatened to use "his piece" on the victim if he kept trying to break free.

At this time, Gunn and/or Ware stated: "That's what you get for being a snitch" and left the room. Boisette told the victim (who was crying) that she was sorry and that everything would be all right (an attempt to comfort the victim). The victim was in fear and wanted to commit suicide.

Boisette told the victim that she would protect him and brought him back to her room in Lawrence Towers. He was still wearing his urine soaked clothes. He also complained to Boisette that "his anus hurts, [and] he can't really sit down, just his body aches." There the victim took a shower in the community bathroom and changed his clothes. After taking a shower, Boisette and the victim drove off campus to Boisette's friend's residence where she told her friend what happened. Next, she and the victim went to an afternoon movie at the Tinseltown Theater, stopped at McDonald's for food, and returned to Boisette's room between 6:30 and 7:00 PM. While at Boisette's friend's house and on the way to Tinseltown Theater, Boisette and the victim smoked marijuana.

Later, Boisette returned alone to Shaffer Hall. Around 8:00 PM, the distraught victim called his mother because he was afraid he was "going to commit suicide." He told her he had been sexually assaulted and was too ashamed to call the police. His mother persuaded him to call them.

After giving a statement to the police, [the victim] was taken to the police station and then to St. Vincent's Health Center to be examined by a forensic nurse. The nurse photographed the victim's injuries. She also performed an examination and a doctor diagnosed a rectal tear. The victim's other injuries included a head laceration from the

3

belt and a bruise on his left forearm. During the investigation, Sgt. Eric Kraus obtained the victim's videotaped statement.

Two to three hours after the victim's assault, during a conversation with student David Arnold, Gunn said: "whatever you hear wasn't true, we just roughed him up a little, you know, nothing more than that." On the afternoon of the same day, Gunn and/or Ware[15] told Luke Raymer and John Matters that earlier in the morning they had helped Boisette sodomize the victim.

[15] One of the defendants talked about the sodomization while the other remained silent. The witnesses were unsure who spoke, but were certain that both defendants were present for the conversation.

(CP Dkt. No. 50 at 2-8 (citations to trial transcript and additional footnotes omitted)).

The trial court sentenced Petitioner to an aggregate term of 8-16 years' incarceration. On appeal, Petitioner contended, in relevant part, that there was insufficient evidence to support the jury's verdict. On July 5, 2007, the Superior Court of Pennsylvania issued a Memorandum in which it rejected that claim on the merits and affirmed Petitioner's judgment of sentence. (CP Dkt. No. 33). The Supreme Court of Pennsylvania denied a petition for allowance of appeal on February 27, 2008. (CP Dkt. No. 32).

In August of 2009, Petitioner filed a *pro se* motion under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.* (CP Dkt. No. 35). The PCRA court appointed Dennis v. Williams, Esq., to represent him and counsel filed a supplemental PCRA motion in which it was contended, in relevant part, that Petitioner's trial counsel, Charles Schwartz, Esq., provided him with ineffective assistance in violation of his Sixth Amendment rights. (CP Dkt. Nos. 43, 44, 50).

On April 14, 2009, the PCRA court issued an Opinion and Order in which it denied each of Petitioner's claims on the merits. It concluded "trial counsel and direct appellate counsel's representation of the Petitioner was extremely competent, especially given the overwhelming evidence presented by the Commonwealth and the few defense options available." (CP Dkt. No. 50 at 22). Petitioner, through

4

Williams, filed an appeal with the Superior Court in which he raised, in relevant part, the following issues:

1. Was counsel ineffective for failing to present a defense predicated on the theory of consent?

2. Was Petitioner denied effective assistance for failing to present and utilize the videotaped statement of the victim for the purpose of impeachment as well as other significant impeachment material involving material witnesses? and,

3. Was counsel ineffective for failing to request a missing witness charge as to Officer Schaeffer?

(CP Dkt. No. 53 at 6).

The Superior Court denied Petitioner's claims in a Memorandum it issued on February 18, 2010. (CP Dkt. No. 53). On September 12, 2011, the Supreme Court of Pennsylvania denied a petition for allowance of appeal. (CP Dkt. No. 56).[2]

In the petition for a writ of habeas corpus that Petitioner has filed with this Court, he raises in Ground One the three claims of ineffective assistance of counsel set forth above. In Ground Two, he claims, as he did in his direct appeal, that there was insufficient evidence to support the jury's verdict that he was guilty of aggravated assault.

---

[2] In June of 2012, Petitioner filed a second *pro se* PCRA motion in which he claimed that Schwartz was ineffective for advising him not to accept the offered plea deal. (CP Dkt. No. 57). The PCRA court denied the motion as untimely. On February 6, 2013, the Superior Court quashed Petitioner's subsequent appeal. It held that the second PCRA motion "is untimely on its face and [Petitioner] has failed to establish an exception to the PCRA's time-bar," and, therefore, it lacked jurisdiction to entertain his appeal. (CP Dkt. No. 63 at 3).

5

### C. Ineffective Assistance of Counsel

### (1) The Superior Court's adjudication

Petitioner contends that his Sixth Amendment right to effective trial counsel was violated for the three reasons set forth above. The Superior Court denied these claims on the merits. It held:

> [I]n order to obtain relief on a claim alleging ineffective assistance of counsel, a petitioner must prove that: (1) the claim underlying the ineffectiveness claim has arguable merit; (2) counsel's actions lacked any reasonable basis; and (3) counsel's actions resulted in prejudice to petitioner. "A chosen strategy will not be found to have lacked a reasonable basis unless it is proven 'that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.' " "Prejudice in the context of ineffective assistance of counsel means demonstrating that there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different."
> - - -
> Commonwealth v. Cox, 983 A.2d 666, 678-79 (Pa. 2009) (footnotes, citations, and quotation marks omitted).
>
> [Petitioner's] first two claims are interrelated. He contends that the trial counsel originally planned to present a consent defense, but then abandoned that defense at some point and switched to a bare claim of "non-involvement." [Petitioner] contends that counsel was ineffective for switching strategies without a reasonable basis. [Petitioner's] related argument is that trial counsel was ineffective for failing to introduce a videotaped statement from the victim that allegedly would have helped to establish the consent defense.
>
> By way of background, the claim of "non-involvement" manifested itself at trial as follows. [Petitioner] testified that he and Gunn did accuse the victim of being a "snitch," but they then merely engaged in light "tussling" and horseplay after that accusation. (Notes of testimony, 4/20/06 at 25-26). With no prior involvement or encouragement from [Petitioner] or Gunn, Ms. Boisette then entered the room with her sex kit and bucket, and began yelling at the victim about a bottle of alcohol. (Id. at 28-29). Ms. Boisette then began to urinate in the bucket, but [Petitioner] and Gunn left the room. [Petitioner] and Gunn then re-entered the room and heard Boisette give the victim (who was now wet with urine) the choice of a beating or the dildo. The victim allegedly stated that he would take the beating like a man. Boisette then ordered him to bend over, smacked him with the belt, ordered him to take his pants off, then inserted the dildo repeatedly into the victim's anus. (Id. at 30-37). According to [Petitioner], he and Gunn did nothing but stand and watch.

6

[Petitioner] now asserts that this defense was not "realistic,"[2] and that "the only realistic approach was consent." ([Petitioner's] brief at 20). Specifically, [Petitioner] argues that counsel should have introduced a videotaped statement that the victim made to police shortly after the incident. [Petitioner] contends that the statement would have shown that the victim consented to the sexual activity. Specifically, [Petitioner] focuses on a statement in the videotape where the victim asked Boisette, "why did you stop?" [Petitioner] implies that the victim was essentially complaining because he did not want Boisette to stop the use of the dildo. [Petitioner] argues that counsel was ineffective for failing to introduce the statement as expected.

> [2] As the prosecutor put it less charitably at sentencing, [Petitioner] and Gunn "fabricated a ridiculous story that was rejected by every single individual that heard it. Not only that, but they blamed the victim for what happened to him." (Notes of testimony, 7/25/06 at 17).

The PCRA court rejected this argument. The court reviewed the videotaped statement and concluded that: (1) it was not exculpatory; (2) it did not contain evidence of consent; and (3) it was overwhelmingly consistent with the victim's trial testimony that [Petitioner] and Gunn actively participated in the assault by punching him and holding him down. The court also reasoned that the question, "Why did you stop?" was taken out of context, and that it did not show [Petitioner's] consent to the sexual activity. The court concluded that counsel had a reasonable basis for not introducing the statement into evidence as a defense exhibit. (PCRA court opinion, 4/14/09 at 13-14, 20-21).[3]

> [3] [Petitioner's] trial counsel did not testify at the PCRA evidentiary hearing because he was living in Europe at the time. (Notes of testimony, 2/24/09 at 2).

We see no abuse of discretion or error of law in this assessment. Indeed, we agree with the PCRA court that introducing a nearly-contemporaneous and largely consistent statement by the victim to police would not have been helpful, and could have easily been harmful. Any marginal benefit that [Petitioner] could have obtained by introducing the statement (*e.g.*, to explore certain inconsistencies between the statement and the victim's trial testimony) would have been outweighed by the jury hearing essentially the same consistent story twice. [Petitioner] has failed to demonstrate that the "alternative not chosen offered a potential for success substantially greater than the course actual pursued." Cox.

We also note that [Petitioner] and Gunn essentially *did* present a consent defense. [Petitioner] testified at trial that no one forced the victim to take the beating from Boisette. Rather, the victim took the abuse willingly (albeit while "crying and yelling"), while [Petitioner] and Gunn stood and watched. (Notes of testimony, 4/20/06 at 37-38). Since there was no evidence that Boisette physically restrained the victim in order to perpetrate the sodomy, the only reasonable conclusion from the co-defendants' testimony was that the abuse was consensual. Indeed, Gunn went so far as to expressly state that the abuse was consensual. (Id. at 132-133). At most, [Petitioner] is arguing that counsel was

7

ineffective for failing to present additional evidence to bolster this defense. As noted above, the PCRA court did not err in concluding that counsel had a reasonable basis for failing to present this evidence. Indeed, [Petitioner's] own summary of the victim's videotaped statement indicates that [Petitioner] and Gunn held the victim down while the victim struggled to get away. ([Petitioner's] brief at 17). It is highly unlikely that the victim's statement could be parlayed into any plausible support for a consent theory.[4] [Petitioner's] first two claims fail.

> [4] This abuse took place in a semi-open dorm room, in the morning, with two individuals present who had just accused the victim of being a "snitch." These facts, along with the testimony of neutral witnesses set forth above, render a viable consent defense hopeless. It would appear that [Petitioner's] real problem lay in the fact that he simply had no believable defense to the charges.

> Third, and again in a related vein, [Petitioner] argues that counsel was ineffective for failing to request a "missing witness" charge as to Sergeant Schaeffer, the officer who took the videotaped statement from the victim.
> - - -
> In this instant case, [Petitioner] argues that the only way to introduce the videotaped statement would have been to subpoena Sergeant Schaeffer, because he was the one who interviewed the victim. ([Petitioner's] brief at 29). In other words, Sergeant Schaeffer's testimony would serve primarily as a conduit for introducing the videotape, not necessarily as independent support for [Petitioner's] position. (See [Petitioner's] brief at 26-27, 31). Because we have already rejected [Petitioner's] primary claim regarding the videotape, this secondary claim necessarily fails. We also note that Sergeant Schaeffer's testimony (as the person who interviewed the victim) was clearly inferior to that of the other Commonwealth witnesses presented at trial, notably that of the victim himself and Ms. Boisette. [Petitioner] has also failed to establish that Sergeant Schaeffer was peculiarly within the control of the Commonwealth. For these additional reasons, [Petitioner] has failed to establish that a missing witness instruction would have been warranted. This claim lacks arguable merit.

(CP Dkt. No. 53 at 7-12).

### (2) Review of the Superior Court's adjudication of these claims under 28 U.S.C. § 2254(d)

Because the Superior Court denied Petitioner's ineffective assistance of counsel claims on the merits, this Court's analysis of them is governed by the Antiterrorism and Effective Death Penalty Act's ("AEDPA's") standard of review, which is codified at 28 U.S.C. § 2254(d). Thus, it is not for this Court to decide whether the Superior Court's decision was right or wrong. Rather, this Court has the authority

8

to issue the writ of habeas corpus only if the Superior Court's adjudication "resulted in a decision that was contrary to,[3] or involved an unreasonable application of,[4] clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[5] 28 U.S.C. § 2254(d).

The "clearly established Federal law," 28 U.S.C. § 2254(d)(1), in which to analyze Petitioner's ineffective assistance claims are governed by Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, Petitioner must show that his Schwartz's representation fell below an objective standard of reasonableness. 466 U.S. at 688; see also Williams, 529 U.S. at 390-91. The law presumes that Schwartz

---

[3] "The test for § 2254(d)(1)'s 'contrary to' clause is whether the state court decision 'applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result.' Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams v. Taylor, 529 U.S. 362, 405 (2000), and Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)). Of course, a state court's resolution of a question that the Supreme Court has not resolved can be neither contrary to, nor an unreasonable application of, the Court's precedent. See Kane v. Garcia Espitia, 546 U.S. 9 (2005)." Rountree v. Balicki, 640 F.3d 530, 537 (3d Cir. 2011) (bracketed text in original) (parallel citations omitted).

[4] "The test for § 2254(d)(1)'s 'unreasonable application of' clause is as follows: '[a]n 'unreasonable application' occurs when a state court 'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case.' Rompilla v. Beard, 545 U.S. 374, 380 (2005) (quoting Wiggins v. Smith, 539 U.S. 510, 519, 520 (2003)). For purposes of § 2254(d)(1), '[i]t is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous.' Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (internal quotations omitted). "Under § 2254(d)(1)'s 'unreasonable application' clause ... a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' Id. at 75-76, 123 S.Ct. 1166 (quoting Williams v. Taylor, 529 U.S. 362, 411 (2000)). Rather, '[t]he state court's application of clearly established law must be objectively unreasonable' before a federal court may grant the writ. Andrade, 538 U.S. at 75." Rountree, 640 F.3d at 537 (parallel citations omitted).

[5] "The test for § 2254(d)(2)'s 'unreasonable determination of facts' clause is whether the petitioner has demonstrated by 'clear and convincing evidence,' § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record. See Rice v. Collins, 546 U.S. 333, 338-339 (2006) ('State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' ') (quoting § 2254(e)(1)) (citing Miller-El v. Dretke, 545 U.S. 231, 240 (2005)); see also Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009) ('Under the § 2254 standard, a district court is bound to presume that the state court's factual findings are correct, with the burden on the petitioner to rebut those findings by clear and convincing evidence.'). Importantly, the evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication. Cullen v. Pinholster, — U.S. — [ ], 131 S.Ct. 1388, 1401-03 (2011)." Rountree, 640 F.3d at 537-38 (parallel citations omitted).

9

was effective. Id. at 689. Strickland also requires that Petitioner demonstrate that he was prejudiced by Schwartz's alleged deficient performance. This requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] proceeding would have been different." Id. at 694. See also Brown v. Wenerowicz, 663 F.3d 619, 630 (3d Cir. 2011).

Since the Superior Court applied the correct legal standard when it evaluated Petitioner's ineffective assistance claims (CP Dkt. No. 53 at 7),[6] there can be no question that its adjudication withstands review under the "contrary to" clause of § 2254(d)(1). Williams, 529 U.S. at 406 ("a run-of-the mill state-court decision applying the correct legal rule from [Supreme Court] cases [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.").

The only remaining question for this Court is whether Petitioner has met his burden of demonstrating that the Superior Court's adjudication was an "unreasonable application of" Strickland or an unreasonable determination of the facts. 28 U.S.C. § 2254(d). The Supreme Court has stressed the "highly deferential" review that this Court must accord the state court's in conducting its analysis:

> We have explained that "an unreasonable application of federal law is different from an incorrect application of federal law." Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id., at 411, 120 S.Ct. 1495. Rather, that application must be "objectively unreasonable." Id., at 409, 120 S.Ct. 1495. This distinction creates "a substantially higher threshold" for obtaining relief than *de novo* review. Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and "demands that state-court decisions be given the benefit of the doubt," Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).

---

[6] Pennsylvania law for judging ineffectiveness corresponds with the Strickland standard. Commonwealth v. Pierce, 527 A.2d 973, 976-77 (Pa. 1987); Commonwealth v. Kimball, 724 A.2d 326 (Pa. 1999). Although Pennsylvania courts typically articulate a three-prong test for gauging ineffective assistance claims and Strickland sets forth its test in two prongs, the legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts.

10

Renico v. Lett, 559 U.S. 766, 773 (2010). See also Harrington v. Richter, — U.S. —, 131 S.Ct. 770, 786 (2011) ("If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings…. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther."). The Court also is mindful that:

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," [Strickland, 466 U.S.] at 689, 104 S.Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, [Knowles v. Mirzayance, 556 U.S. at —, 129 S.Ct. 1411, 1420 (2009)]. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at —, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard*.

Harrington, 131 S.Ct. at 788 (emphasis added).

There is no basis for this Court to conclude that the Superior Court's decision was either an "unreasonable application of" Strickland or an unreasonable determination of the facts. Indeed, Petitioner has not demonstrated that Schwartz was ineffective, let alone that Superior Court's decision to deny relief on these ineffective assistance claims was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S.Ct. at 786-87.

Based upon all of the foregoing, Petitioner's claims that Schwartz was ineffective should be denied on the merits.

11

## D. Insufficient Evidence to Support the Jury's verdict

### (1) The Superior Court's adjudication

In his second ground for relief, Petitioner claims that there was insufficient evidence to support the jury's verdict that he was guilty of the crime of aggravated assault.[7] In addressing this claim, the Superior Court summarized the evidence introduced at Petitioner's trial and then held:

[O]ur Supreme Court set forth the sufficiency of the evidence standard:

> Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Commonwealth v. Karkaria, 533 Pa. 412, 625 A.2d 1167 (1993). Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. Commonwealth v. Santana, 460 Pa. 482, 333 A.2d 876 (1975). When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Commonwealth v. Chambers, 528 Pa. 558, 559 A.2d 630 (1991).

[Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. 2000)].

The crimes of which [Petitioner] was convicted are set forth in the Crimes Code as follows.
- - -
**§ 2702. Aggravated assault**

(a) OFFENSE DEFINED. – A person is guilty of aggravated assault if he:

---

[7] Petitioner also contends that the trial court's instruction to the jury regarding the crime of aggravated assault was "improper." [ECF No. 1 at 8]. He raised this same allegation to the PCRA court when he contended that Schwartz was ineffective for failing to object to the alleged improper instruction. The PCRA court held that the "jury instruction accurately defined the elements of aggravated assault[,]" (CP Dkt. No. 50 at 19), and this Court may not re-examine state court determinations on state law questions. See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Priester v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004); Real v. Shannon, 600 F.3d 302, 309-10 (3d Cir. 2010); Johnson v. Rosemeyer, 117 F.3d 104, 109 (3d Cir. 1997). Moreover, Petitioner did not raise this claim in his subsequent appeal to the Superior Court (see CP Dkt. No. 53 at 6) and, therefore, it is procedurally defaulted. See, e.g., Lines v. Larkin, 208 F.3d 153, 160 (3d Cir. 2000); Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000). See also Rolan v. Coleman, 680 F.3d 311, 317 (3d Cir. 2012) ("Procedural default occurs when a claim has not been fairly presented to the state courts (i.e., is unexhausted) and there are not additional state remedies available to pursue[.]").

> (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life ….

18 Pa.C.S. § 2702(a)(1).

- - -

> Our review of the record, in the light most favorable to the Commonwealth, reflects ample support for the following facts surrounding the incident[.]

- - -

> In the present case, the heinous details recited in the trial court opinion unequivocally establish that there was sufficient evidence to convict [Petitioner] of the above-mentioned offenses. The evidence demonstrated that [Petitioner] acted in concert with his co-defendants and equally participated in carrying out the retaliatory acts against the victim. [Petitioner] mistakenly bases his sufficiency-of-the-evidence claim on the fact that his testimony contradicted the testimony of the Commonwealth's witnesses, and thus, upon that basis, requests reversal. Under a sufficiency-of-the-evidence standard, however, the issue is not whether there is contradictory testimony, but whether the Commonwealth has proved the elements of the crime. Moreover, where there is conflicting evidence, it is the province of the fact finder to determine credibility, and it is well established that
>
>> A sufficiency argument founded upon a mere disagreement with the credibility determinations made by the fact finder, or discrepancies in the accounts of witnesses, does not warrant the grant of appellate relief, for it is within the province of the fact finder to determine the weight to be accorded each witnesses's testimony and to believe all, part, or none of the evidence introduced at trial.
>
> Commonwealth v. Johnson, 910 A.2d 60, 65 (Pa.Super. 2006) (internal quotations and citations omitted). Thus, [Petitioner's] attempt to undermine the testimony of the victim and the other witnesses is unpersuasive. Accordingly, the evidence presented at trial was sufficient to convict [Petitioner] of the above-mentioned crimes.

(CP Dkt. No. 33 at 3-7).

### (2) Review of the Superior Court's adjudication of this claim under 28 U.S.C. § 2254(d)

The "clearly established Federal law," 28 U.S.C. § 2254(d)(1), in which to analyze this claim is set forth in Jackson v. Virginia, 443 U.S. 307 (1979). "The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt" of each element of the

offense. Id. at 309. Under Jackson, evidence is sufficient to support a conviction if, "after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original). "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, — U.S. — , 132 S.Ct. 2060, 2064 (2012) (*per curiam*) (quoting Jackson, 443 U.S. at 319).

In rejecting this insufficiency of the evidence claim, the Superior Court applied the Pennsylvania equivalent of the Jackson standard. See also Evans v. Court of Common Pleas, Delaware Cnty., 959 F.2d 1227, 1233 (3d Cir. 1992) (the test for insufficiency of the evidence is the same under both Pennsylvania and federal law). Because the Superior Court applied the correct legal standard, its adjudication satisfies review under the "contrary to" clause of § 2254(d)(1). See, e.g., Williams, 529 U.S. at 406.

This Court next must decide whether the Superior Court's decision was an "unreasonable application of" Jackson or based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). The Supreme Court has stressed to federal habeas courts conducting this analysis that:

> [w]e have made clear that Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury [or, in the case of Petitioner's non-jury trial, the trial judge] … to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the [trial court's] verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the [trial court]." Cavazos v. Smith, 565 U.S. 1, __ (2011) (*per curiam*) (slip op., at 1). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Ibid. (quoting Renico v. Lett, 559 U.S. __, __ (2010) (slip op., at 5)).

- - -

14

> [T]he only question under Jackson is whether [the state court's] finding was so insupportable as to fall below the threshold of bare rationality. The state court of last review did not think so, and that determination in turn is entitled to considerable deference under AEDPA, 28 U.S.C. § 2254(d).

Coleman, 132 S.Ct. at 2062, 2065.

Petitioner has no viable argument that the Superior Court's decision was an "unreasonable application of" Jackson or based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). At most, Petitioner's actual complaint is that the jury's verdict was *against the weight of the evidence*. That is purely a state law claim that is distinct from a federal due process claim, and, as such, it is not a claim that is cognizable in federal habeas corpus. Tibbs v. Florida, 457 U.S. 31, 37-45 (1982) (weight of evidence claims raise questions of credibility; it is different from a claim that the evidence was insufficient to support the conviction); see also Young v. Kemp, 760 F.2d 1097, 1105 (11th Cir.1985).

Based upon all of the foregoing, Petitioner's claim that there was insufficient evidence to support the jury's verdict must be denied. This Court, which must give "considerable deference under AEDPA," to the Superior Court's adjudication of this same claim, Coleman, 132 S.Ct. at 2065, cannot grant Petitioner relief under the circumstances presented here.

### E. Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. 28 U.S.C. § 2253 provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Applying that

standard here, jurists of reason would not find it debatable whether Petitioner's claims should be denied. Accordingly, a certificate of appealability should be denied.

### III.  CONCLUSION

For the foregoing reasons, it is respectfully recommended that the petition for a writ of habeas corpus be denied and that a certificate of appealability be denied.

Pursuant to the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules, the petitioner must seek review by the district court by filing objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to do so will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n.7 (3d Cir. 2011).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated: October 18, 2013

cc:   The Honorable Nora Barry Fischer
      United States District Judge